# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,** | **Case No.** |
| **Plaintiff,** | |
| **v.** | **COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT** |
| **OMEGA KNIGHT 2, LLC, AVIV MICHAEL HEN, and EREZ HEN,** | |
| **Defendants.** | |

Plaintiff Commodity Futures Trading Commission ("Commission") alleges as follows:

## I.    SUMMARY

1.      From March 2013 and continuing through at least June 2017 (the "Relevant Period"), Defendant Omega Knight 2, LLC ("Omega Knight"), by and through the actions of its owner, employees, and agents, including Defendants Aviv Michael Hen ("Aviv Hen") and Erez Hen ("Eric Hen") (collectively, "Defendants"), engaged in a scheme to defraud customers located throughout the United States in connection with precious metals transactions.

2.      Defendants offered to enter into, and conducted an office or business in the United States for the purpose of soliciting or accepting orders for, the purchase or sale of precious metals from customers on a leveraged or financed basis (collectively, "leveraged precious metals transactions" or "retail commodity transactions") and on a fully-paid basis ("fully-paid precious metals transactions").

3.     Defendants made numerous false statements to induce customers to enter into leveraged and fully-paid precious metals transactions, and Defendants received at least $5.5 million from at least 90 customers in connection with these transactions.

4.     Defendants' leveraged precious metals transactions never resulted in actual delivery of the full amount of metal purchased to customers.  In addition, Defendants used only part of the total funds collected from customers to purchase precious metals for those customers' fully-paid precious metals transactions.

5.     Instead, Defendants misappropriated customer funds to pay personal expenses, to distribute purported "profits" and disbursements to other customers, and to fund Omega Knight's operations.

6.     Through the issuance of false trade confirmations and account statements and other communications to customers, Defendants concealed their misappropriation and fraudulent scheme.

7.     In addition, Defendants' leveraged precious metals transactions constituted illegal, off-exchange retail commodity transactions.  As part of Defendants' scam, Omega Knight acted as an unregistered futures commission merchant ("FCM") by engaging in these transactions without being registered as required by law.

8.     By this conduct, Defendants  have engaged, are engaging, or are about to engage in conduct that violates Sections 4(a), 4b(a)(2)(A)-(C), 4d(a)(1), and 6(c)(1) of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 6(a), 6b(a)(2)(A)-(C), 6d(a)(1), and 9(1) (2012), and Commission Regulation ("Regulation") 180.1(a) (2017), 17 C.F.R. § 180.1(a) (2017).

9.     Aviv Hen controlled Omega Knight throughout the Relevant Period and failed to act in good faith or knowingly induced Omega Knight's violations alleged herein.  He is

therefore liable for Omega Knight's violations as a controlling person pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

10.     At all relevant times, the acts and omissions of Aviv Hen, Eric Hen, and any other managers, employees, and agents of Omega Knight were committed within the scope of their employment, agency, or office with Omega Knight; therefore, Omega Knight is liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017), as a principal for the actions and omissions of Aviv Hen, Eric Hen, and any other manager, employee, or agent of Omega Knight, in violation of the Act.

11.     Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), the Commission brings this action to enjoin Defendants' unlawful acts and practices, to compel their compliance with the Act, and to further enjoin them from engaging in certain commodity-related activities.

12.     Additionally, the Commission seeks civil monetary penalties, restitution, and remedial ancillary relief, including but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre-judgment and post-judgment interest, and such other relief as the Court may deem necessary or appropriate.

13.     Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint, or similar acts and practices, as more fully described below.

## II.     JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2012) (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (2012) (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  In addition, Section 6c(a) of the

Act, 7 U.S.C. § 13a-1(a) (2012), provides that district courts have jurisdiction to hear actions brought by the Commission for injunctive relief or to enforce compliance with the Act whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in, an act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

15.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because Defendants transacted business in the Southern District of Florida, and certain transactions, acts, and practices alleged in this Complaint occurred within this District.

### III.     THE PARTIES

16.     Plaintiff **Commodity Futures Trading Commission** ("Commission") is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act, 7 U.S.C. §§ 1–26 (2012), and the Commission Regulations promulgated thereunder, 17 C.F.R. §§ 1.1–190 (2017).

17.     Defendant **Omega Knight 2, LLC** ("Omega Knight") is a New York limited liability company, formed in March 2013, that is currently active.  During the Relevant Period, Omega Knight regularly conducted business from offices in Miami, Florida, Hallandale Beach, Florida, and Great Neck, New York.  Omega Knight has never been registered with the Commission in any capacity.

18.     Defendant **Aviv Michael Hen** ("Aviv Hen") is a resident of Great Neck, New York.  During the Relevant Period, Aviv Hen was Omega Knight's President and CEO, managing partner, owner, principal, and controlling person responsible for its day-to-day operations.  During the Relevant Period, Aviv Hen resided and worked in New York.  Aviv Hen has never been registered with the Commission in any capacity.

19.     For most of the period from June 2002 through August 2012, Aviv Hen was registered as a broker-dealer agent with several broker-dealers registered with the Financial Industry Regulatory Authority ("FINRA").  On August 25, 2014, a FINRA Arbitration Panel issued an award ordering Aviv Hen to pay $166,357.87 in compensatory damages to a customer based on claims of, among other things, fraud, unsuitability, and breach of fiduciary duty.  On July 13, 2015, FINRA suspended Aviv Hen's registration for failure to comply with an arbitration award or settlement agreement or to satisfactorily respond to a FINRA request to provide information concerning the status of compliance.

20.     During the Relevant Period, Defendant **Erez Hen** ("Eric Hen"), a close relative of Aviv Hen, was an employee and agent of Omega Knight and its Managing Director, Southeast Territory.  Eric Hen solicited and fraudulently induced customers to engage in fully-paid and leveraged precious metals transactions.  During the Relevant Period, Eric Hen resided and worked in Florida.  Eric Hen has never been registered with the Commission in any capacity.

### IV.     STATUTORY BACKGROUND

21.     Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), in relevant part, makes it unlawful for "any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with . . . a contract of sale of any commodity in interstate commerce . . . any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate."

22.     Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017), in relevant part, makes it unlawful for any person, in connection with a contract of sale of any commodity in interstate commerce to intentionally or recklessly: (1) use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to

make the statements made not untrue or misleading; or (3) engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

23.    Section 2(c)(2)(D)(i) of the Act, 7 U.S.C. § 2(c)(2)(D)(i) (2012), applies certain provisions of the Act to "any agreement, contract, or transaction in any commodity" that is entered into with, or offered to, a non-eligible contract participant "on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis" (the aforementioned "leveraged precious metals transactions" or "retail commodity transactions"), subject to certain exceptions not applicable here.

24.    Section 2(c)(2)(D)(iii) of the Act, 7 U.S.C. § 2(c)(2)(D)(iii) (2012), is an enabling provision, making Sections 4(a) and 4b of the Act, 7 U.S.C. §§ 6(a) and 6b (2012), applicable to retail commodity transactions "as if" such transactions are contracts of sale of a commodity for future delivery.

25.    The Act defines an eligible contract participant ("ECP"), in relevant part, as an individual (a) who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or (b) $5 million if the individual enters into the transaction to "manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual."  Section 1(a)(18)(xi) of the Act, 7 U.S.C. § 1a(18)(xi) (2012).

26.    For corporate entities, the Act defines an ECP, in relevant part, as a corporation that has net assets exceeding $10 million and "the obligations of which under an agreement, contract, or transaction are guaranteed or otherwise supported by a letter of credit . . . ."  Section 1(a)(18)(v) of the Act, 7 U.S.C. § 1a(18)(v) (2012).  Alternatively, the Act provides that an ECP may be a corporate entity with a net worth exceeding $1 million that "enters into an

agreement . . . in connection with the conduct of the entity's business or to manage the risk . . .

likely to be . . . incurred by the entity in the conduct of . . . [its] business." Section 1a(18)(v) of

the Act, 7 U.S.C. § 1a(18)(v)(2012).

27.     Section 4(a) of the Act, 7 U.S.C. § 6(a) (2012), in relevant part, makes it unlawful

for any person to offer to enter into, execute, confirm the execution of, or conduct any office or

business anywhere in the United States for the purpose of soliciting, accepting any order for, or

otherwise dealing in any transaction in, or in connection with, a contract for the purchase or sale

of a commodity for future delivery unless the transaction is conducted on or subject to the rules

of a board of trade that has been designated or registered by the Commission as a contract

market.

28.     Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C) (2012), in relevant

part, makes it unlawful for any person, in or in connection with any order to make, or the making

of, any contract of sale of any commodity for future delivery that is made, or to be made, for or

on behalf of, or with any other person, other than on or subject to the rules of a designated

contract market: (A) to cheat or defraud or attempt to cheat or defraud the other person; (B)

willfully to make or cause to be made to the other person any false report or statement, or

willfully to enter or cause to be entered for the other person any false record; or (C) willfully to

deceive or attempt to deceive the other person by any means whatsoever in regard to any order or

contract or the disposition or execution of any order or contract, or in regard to any act of agency

performed, with respect to any order or contract for, on behalf of, or with the other person.

29.     Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1) (2012), in relevant part, provides

that it shall be unlawful for any person to be a FCM unless such person is registered with the

Commission in that capacity.  In pertinent part, Section 1a(28) of the Act, 7 U.S.C. § 1a(28)

(2012), defines an FCM as "an individual, association, partnership, corporation, or trust . . . engaged in soliciting or in accepting orders for . . . any agreement, contract, or transaction described in . . . section 2(c)(2)(D)(i) [of the Act]; and accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom."

## V.     <u>FACTS</u>

### A.     <u>Overview of Omega Knight's Fraudulent Precious Metals Scheme</u>

30.    During the Relevant Period, Defendants solicited customers to enter into fully-paid and leveraged precious metals transactions based on fraudulent misrepresentations.

31.    During the Relevant Period, Defendants also solicited and entered into illegal, off-exchange leveraged precious metals transactions throughout the United States with customers who were not eligible contract participants.

32.    In total, during the Relevant Period, at least 90 customers bought precious metal from Omega Knight either on a fully-paid or leveraged basis.  Omega Knight collected at least $5.5 million from these customers.  These customer funds were deposited into bank accounts in the name of Omega Knight that Aviv Hen owned and controlled.  Omega Knight and Aviv Hen then used customer funds for a variety of expenditures unrelated to their customers' precious metals transactions.

33.    Omega Knight concealed its misappropriation of customer funds by fraudulently misrepresenting losses and fees incurred by customers.

34.    Omega Knight's fraudulent scheme involved selling precious metals in three major ways.  First, some Omega Knight customers paid in full for precious metal and took delivery of it.  Second, some customers paid in full for precious metal, but did not take delivery.

For these customers, Omega Knight was supposed to store their precious metals. Third, Omega Knight's leveraged precious metals customers entered into leveraged precious metals transactions (buying precious metal on a leveraged or financed basis). Some customers in this third category initially bought precious metals on a fully-paid basis and later were transitioned by Omega Knight to leveraged precious metals investments.

35.     Omega Knight's leveraged precious metals customers paid an amount of money *less* than the total value of the metal they were purchasing with the understanding that they would be borrowing from Omega Knight the remainder of the purchase price or otherwise using leverage to buy metal with a value greater than the amount paid to Omega Knight. Omega Knight did not deliver the full amount of purchased metal to these customers. Instead, Omega Knight represented that it would store customers' metal for them.

36.     Omega Knight charged its leveraged precious metals customers storage fees for the metal and interest on the amount borrowed. Omega Knight also charged commissions and insurance fees.

37.     An Omega Knight website during the Relevant Period advertised that Omega Knight offered stored bullion investing (described as purchasing bullion and having it stored and fully insured at a secured depository), physical delivery investing (described as allowing Omega Knight to physically deliver precious metal), and tax deferred investing in IRAs and similar vehicles.

38.     Omega Knight's website also stated that the company did not buy, sell, offer, trade, solicit, or manage any type of commodity futures contracts, rolling spot contracts, or any type of futures trading and futures vehicles. Omega Knight's statement was misleading and false.

39.     In reality, during the Relevant Period, Omega Knight, Aviv Hen in his capacity as controlling person of Omega Knight, and Eric Hen were routinely soliciting customers for, and entering into contracts for, off-exchange leveraged precious metals transactions that are treated as futures contracts under the Act.

40.     Omega Knight and Eric Hen initially sold metal on a fully-paid basis to some customers, but later persuaded those customers to buy metal on a leveraged basis.  This "bait and switch" tactic benefitted Omega Knight, because when it sold metal on a leveraged basis it was able to charge storage fees, interest, and insurance, all of which were subtracted from the customer's investment amount.

41.     Omega Knight and Eric Hen at times fraudulently misrepresented the amount of these fees and often charged its customers substantially higher fees than were, in reality, incurred.  These charges were often excessive.  For example, over a five-month period from December 2014 to April 2015, Omega Knight charged one customer $8,165 in interest, storage fees, commissions, and insurance on a total investment of $48,723.76, almost 17% of the total investment amount.

42.     Omega Knight and Eric Hen fraudulently induced some of its leveraged metal customers to invest by making false representations regarding the returns that customers could expect on leveraged metal investments.

43.     At all times during the Relevant Period, Aviv Hen was the owner and controlling person of Omega Knight.  Aviv Hen was a signatory on, opened, and controlled Omega Knight's bank accounts; managed the day-to-day operations of Omega Knight; entered into agreements with precious metals refineries on behalf of Omega Knight; and communicated with precious

metals refineries on behalf of Omega Knight in connection with Omega Knight's operations and customer transactions.

**B.**     **Phase I of Omega Knight's Fraudulent Scheme (2013-2016)**

44.     In 2013, Omega Knight began soliciting customers for precious metals transactions.

45.     In August 2014, Omega Knight entered into a formal agreement ("Leveraged Metals Agreement") with a Florida-based precious metals refinery ("Florida Refinery") to facilitate the sale of leveraged precious metals to Omega Knight customers.

46.     Aviv Hen signed the Leveraged Metals Agreement with the Florida Refinery on behalf of Omega Knight.

47.     The Leveraged Metal Agreement provided that Omega Knight could purchase precious metal on a leveraged basis from the Florida Refinery for resale to Omega Knight's customers.

48.     Pursuant to the Leveraged Metal Agreement, Omega Knight created operational sub-accounts under Omega Knight's Florida Refinery client ID to allow for segregation of Omega Knight's leveraged customer accounts.  All of these sub-accounts were in the name of, and controlled by, Omega Knight.

49.     Omega Knight contracted with all its customers and, therefore, directly interacted with these leveraged precious metals customers on all transactions.  Omega Knight was, per the Leveraged Metal Agreement, responsible for all margin payments, finance, and storage charges owed to the Florida Refinery.

50.     When Omega Knight sold customers metal on a leveraged basis, it did not deliver the full amount of purchased metal to those customers.

51.     Some leveraged customers did not take delivery of any metal, but were told that Omega Knight would store their entire metal purchase for them.

52.     During Phase I, Omega Knight made misrepresentations to induce customers to enter into fully-paid and leveraged precious metals transactions, as further described below.

53.     Omega Knight also overstated the amount of interest and fees accrued by customer accounts to conceal its misappropriation of customer funds.

**C.     Misappropriation of Customer Funds During Phase I**

54.     Omega Knight did not invest the full amount of money it received from customers, but instead misappropriated customer funds for personal expenditures.

55.     Funds collected from customers during Phase I were deposited in Omega Knight's bank accounts (the "Phase I bank accounts").  Aviv Hen opened and controlled the Phase I bank accounts, and he was a signatory on these accounts.

56.     Omega Knight and Aviv Hen used customer funds deposited in the Phase I bank accounts for a variety of expenditures unrelated to their customers' precious metals transactions.

57.     Aviv Hen used over $25,000 of Omega Knight customer funds deposited in the Phase I bank accounts at high-end restaurants.  For example, on September 3, 2013, Aviv Hen spent $16,735 at B&B Steakhouse in New York, New York, paid for by Omega Knight's customers.

58.     Aviv Hen used over $116,000 of customer funds for his car payments, including a $34,000 down payment on a Mercedes-Benz.

59.     Aviv Hen used $57,500 of customer funds for a single purchase from Sotheby's, a high-end auction house.

60.     Aviv Hen used another $25,000 of customer funds at high-end New York City clothing stores, from the Phase I bank accounts.

61.      Aviv Hen withdrew more than $59,000 in customer cash at ATM machines, from the Phase I bank accounts.

62.     Aviv Hen also transferred more than $650,000 of customer funds, from the Phase I bank accounts, to an "Aviv Hen, Inc." bank account that he personally controlled.

63.     Additionally, Aviv Hen transferred over $200,000 of customer money, from the Phase I bank accounts, to "E Hen, Inc." and "Waterbridge Group" bank accounts controlled by Eric Hen.

64.     In April 2016, shortly after a customer complained to the Florida Refinery that Omega Knight was refusing to deliver the silver he purchased, the Florida Refinery terminated its business relationship with Omega Knight.

D.      **Example of Customer Defrauded During Phase I**

65.     In December 2014, Eric Hen contacted Customer A.  Customer A was the pastor of a religious ministry that had fewer than $2 million in assets.

66.     Eric Hen explained that Customer A could buy silver at $17 an ounce and it would go up to $28 an ounce in three months.  Eric Hen also stated that he was a professional and that he knew when silver would go up or down.

67.     Based on Eric Hen's false assertions regarding his ability to predict future price movements of silver, Customer A initially invested $8,723.76 with Omega Knight on behalf of his religious ministry.  This investment, and Customer A's subsequent investment with Omega Knight, were not intended to manage risk likely to be incurred in the course of the religious ministry's business.

68.     In January 2015, after making this initial investment, Customer A received a telephone call from Eric Hen.  During the call, Eric Hen asserted that he owned the bank and that Customer A would not lose a dime.

69.     Both of these statements by Eric Hen to Customer A were false.

70.     On January 6, 2015, Customer A received an email from Eric Hen stating that Omega Knight would be using 3:1 leverage to purchase "close to $150,000" of silver for Customer A's account.  This statement was false.  In reality, Omega Knight never purchased anything close to $150,000 of silver for Customer A.

71.     In a January 12, 2015 email, Eric Hen told Customer A that he could expect a profit of $42,000 to $88,500 within four weeks.

72.     In reliance on all of these false statements by Eric Hen, Customer A invested an additional $40,000 with Omega Knight, for a total investment of $48,723.76.

73.     Contrary to Eric Hen's assurances, Customer A did not make any profit on his investment and, in fact, incurred a substantial loss.

74.     In a subsequent communication, after Customer A had invested the additional $40,000, Eric Hen once again lied to Customer A.  Eric Hen falsely represented that Omega Knight had bought 5900 ounces of silver at $17.86 per ounce, for a total purchase of $105,374.  In reality, Omega Knight had bought the silver for $16.86 per ounce, for a total purchase of $99,474.

75.     Omega Knight and Eric Hen repeatedly misrepresented to Customer A the size of the leveraged silver position that Customer A would receive in exchange for this investment.

76.     In February 2015, Customer A asked to liquidate a portion of his investment.

14

77.     After Customer A expressed an interest in liquidating his account, Eric Hen sent Customer A an account statement purporting to show that he had been charged an estimated $1,855 in storage fees.  This falsely overstated the actual amount of storage fees that Customer A's sub-account with the Florida Refinery had incurred.  In reality, the Florida Refinery charged Omega Knight only $85.12 to store Customer A's metal.  Omega Knight's fraudulent storage charge was 2,179% larger than the actual storage costs.  Omega Knight never disclosed that it would charge mark-ups on storage fees to Customer A.

78.     According to the same account statement, Customer A had been charged an estimated $1,655 in interest on his investment with Omega Knight.  This falsely overstated the actual amount of interest charged to Customer A's sub-account with the Florida Refinery.  In reality, the Florida Refinery charged Omega Knight only $491.82 in interest on Customer A's leveraged precious metals investment.  Omega Knight's fraudulent interest charge was 336% larger than the actual interest charge.  Omega Knight never disclosed that it would charge mark-ups on interest to Customer A.

79.     By fraudulently overstating the amount of storage fees and interest charged to Customer A's account, Omega Knight concealed its misappropriation of Customer A's funds.

80.     Omega Knight complied with Customer A's initial request to liquidate a portion of his investment and sent him a check for $10,000.  In doing so, Omega Knight fraudulently misrepresented the price at which it sold Customer A's silver and, accordingly, concealed its continued misappropriation of Customer A's funds.

81.     Specifically, according to the account statement that Eric Hen sent to Customer A, in liquidating a portion of his investment, Omega Knight had sold silver at $15.23 an ounce.  The

purported selling price was false.  In reality, Omega Knight liquidated this portion of Customer A's investment at $16.23 per ounce.

82.     By fraudulently understating the price at which it sold Customer A's silver, Omega Knight overstated the size of Customer A's loss, and misappropriated more of Customer A's money.

83.     In April or May of 2015, Customer A asked Omega Knight to deliver to him the silver that he had purchased.  Eric Hen told Customer A that Omega Knight could not do this.

84.     Customer A then requested that the remaining balance of his investment be liquidated.  In response to this request, Customer A received a check for $6,555.20 from Omega Knight.

85.     In total, Customer A sent Omega Knight $48,723.76 to purchase silver, and received back $16,555.20 and a 100 ounce silver bar.

86.     Customer A did not receive any additional money or metal from Omega Knight.

87.     Customer A's investment losses were a direct result of Eric Hen's multiple fraudulent misrepresentations.

**E.     Phase II of Omega Knight's Fraudulent Scheme (April 2016 Through at Least June 2017)**

88.     After the Florida Refinery terminated its relationship with Omega Knight, Omega Knight entered into a new agreement with a Texas-based Refinery ("Texas Refinery") and a depository associated with the Texas Refinery.

89.     Omega Knight's agreement with the Texas Refinery did not provide for leveraged precious metals transactions.  Moreover, Omega Knight's arrangement with the Texas Refinery did not provide for segregated accounts linked to specific Omega Knight customers.

90.    Omega Knight nonetheless continued to solicit customers for precious metals transactions.

91.    When Omega Knight sold customers precious metal on a fully-paid basis, it collected the full purchase price of the metal, but sometimes failed to deliver any purchased metal (or failed to deliver the full amount of purchased metal) to them.  Instead, Omega Knight told those customers that it would buy and store their precious metal purchase for them.

92.    Omega Knight did not maintain segregated accounts linked to specific customers during Phase II.

93.    Funds collected from customers during Phase II were deposited in Omega Knight's bank accounts (the "Phase II bank accounts").  Aviv Hen opened and controlled the Phase II bank accounts, and he was the only signatory on these accounts.

94.    During Phase II, Omega Knight customer funds were commingled in the Phase II bank accounts with other funds unrelated to Omega Knight's business operations.

**F.    Misappropriation of Customer Funds During Phase II**

95.    Omega Knight and Aviv Hen used funds deposited in the Phase II bank accounts for a variety of expenditures unrelated to their customers' precious metals transactions.

96.    Aviv Hen spent over $80,000 at restaurants, including more than $54,000 at Prime 333 in New York City, from the Phase II bank accounts.

97.    Aviv Hen withdrew over $140,000 at ATM machines from the Phase II bank accounts.  Many of these ATM machines were located in casinos.

98.    Aviv Hen paid over $28,000 to a private jet charter service called Jetsmarter, from the Phase II bank accounts.

99.     Aviv Hen spent at least $29,000 at clothing stores from the Phase II bank accounts.

100.     Aviv Hen also transferred over $55,000, from the Phase II bank accounts, to an "Aviv Hen, Inc." bank account that he personally controlled.

101.     Additionally, Aviv Hen transferred over $30,000, from the Phase II bank accounts, to a "Waterbridge Group" bank account controlled by Eric Hen.

102.     As discussed in detail below, Omega Knight falsely represented that it would buy and store a fully-paid customer's precious metals purchase.  In fact, Omega Knight did not purchase the full amount of metal for this customer and failed to store any metal whatsoever in a segregated account for this customer.  When the customer attempted to liquidate his investment, Omega Knight refused to return any of the customer's funds.

G.     **Example of Customer Defrauded During Phase II**

103.     In June of 2016, Eric Hen called Customer B and proposed investing in silver. Eric Hen offered to sell silver to Customer B.

104.     Based on Eric Hen's representations on behalf of Omega Knight, Customer B understood that he was paying for his silver purchase in full and that Omega Knight would purchase and store his silver for him.

105.     On or about July 8, 2016, relying on Eric Hen's representations on behalf of Omega Knight, Customer B sent Omega Knight a $30,051.75 check for his silver purchase.

106.     In July of 2016, Customer B received another call from Eric Hen who said that silver was going to increase in value because of the recent Brexit referendum held in the United Kingdom.  Customer B relied on these representations as well.

107.    On or about August 8, 2016, Customer B paid Omega Knight $46,684.37.
Customer B, again, understood that he was buying silver on a fully-paid basis and that Omega
Knight would purchase and store his silver for him.

108.    Finally, on or about September 13, 2016, Customer B sent Omega Knight a check
for $100,000 for a third silver purchase.  Customer B again understood that he was buying silver
on a fully-paid basis and that Omega Knight would purchase and store his silver for him.

109.    Based on Eric Hen's representations that Omega Knight would purchase and store
Customer B's silver investment for him, Customer B made three payments totaling $176,736.12
to Omega Knight.

110.    Eric Hen's representations to Customer B were false.  Omega Knight did not buy
$176,736.12 of silver for Customer B, but instead misappropriated the funds Customer B
invested, and refused to return any of Customer B's funds, despite his repeated requests.

111.     On or about October 26, 2016, in response to a request on behalf of Customer B,
Eric Hen sent Customer B an account statement showing that Customer B had 7,890 ounces of
silver valued at $151,566.90 in his Omega Knight account as of September 30, 2016.

112.    This was a false account statement.  Omega Knight did not buy silver with the
$100,000 payment it received from Customer B.  Omega Knight never established a segregated
account or sub-account for Customer B and Omega Knight refused to send Customer B any
money when he asked to liquidate his account.

113.    In November 2016, Customer B sought to liquidate his account with Omega
Knight.  After contacting Eric Hen numerous times, Customer B finally received a cashier's
check for $125,000 from Omega Knight.  This amount was significantly less than Customer B's

total investment of $176,736.12 with Omega Knight.  Eric Hen claimed that the value of silver had dropped.

114.     When Customer B attempted to deposit Omega Knight's check, the bank told him that the check was not signed and therefore could not be deposited.  By issuing Customer B an unsigned cashier's check that could not be deposited, Omega Knight attempted to delay discovery of its misappropriation of Customer B's funds.

115.     In January, 2017 Customer B called and emailed Eric Hen numerous times about the unsigned check.  Eventually, Eric Hen told Customer B to mail the check back to Omega Knight, and Customer B complied.

116.     Customer B never received a replacement check from Omega Knight. Customer B subsequently made numerous attempts to communicate with Omega Knight to recover the funds he invested.  Omega Knight never returned any funds to Customer B and never delivered any silver to Customer B.

117.     Based on Eric Hen's misrepresentations, Omega Knight misappropriated $176,736.12 from Customer B.

## VI.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

## COUNT I

## FRAUD IN CONNECTION WITH SALES OF COMMODITIES IN INTERSTATE COMMERCE

### Violations of 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017)

118.     Paragraphs 1 through 117 of this Complaint are re-alleged and incorporated herein by reference.

119.    The precious metals discussed in this Complaint are commodities as defined by Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2012).

120.    The precious metals discussed in this Complaint are commodities in interstate commerce as defined by Section 1a(30) of the Act, 7 U.S.C. § 1a(30) (2012).

121.    Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with . . . a contract of sale of any commodity in interstate commerce . . . any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . . .

122.    Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017), provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
>
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or]
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

123.    During the Relevant Period, Defendants used or employed manipulative or deceptive devices or contrivances, in connection with contracts of sale of any commodity in interstate commerce, including, but not limited to, making untrue or misleading statements of material fact, or omitting material facts necessary to make the statements not untrue or misleading, to Omega Knight customers, such as:

a) Misrepresenting the risk, cost, and profit potential of the precious metals investments offered to customers;

b) Misrepresenting their investment experience and expertise;

c) Misrepresenting that customers acquired allocated, physical precious metal, when in fact Defendants failed to purchase or store metal on customers' behalf;

d) Preparing and issuing trade confirmations and account statements that misrepresented customers' ownership of precious metals and the value of customers' precious metals holdings; and

e) Misrepresenting the value of precious metals purchased for customers.

124.    Moreover, during the Relevant Period, Omega Knight and Aviv Hen misappropriated customer funds, and Eric Hen, by fraudulently soliciting customers, facilitated this misappropriation of customer funds.  Defendants failed to disclose, and omitted, this misappropriation of customer funds.

125.    In connection with this scheme, Defendants used the mails or other instrumentalities of interstate commerce, including, but not limited to:

a) Receiving checks from customers residing in, at least, 30 states, including Florida;

b) Using the Internet to send investment solicitations via e-mail to customers in at least three states; and

c) Using the Internet and the U.S. Mail to send account statements to customers in at least three states.

126.    Omega Knight, Aviv Hen as a controlling person of Omega Knight, and Eric Hen as an employee and agent of Omega Knight, engaged in acts and practices described above knowingly, willfully, or with reckless disregard for the truth.

127.    By this conduct, Defendants violated Section 6(c)(1) of the Act and Regulation 180.1(a).

128.    Each misrepresentation, omission, false statement, and misappropriation made during the Relevant Period is alleged as a separate and distinct violation of Section 6(c)(1) of the Act and Regulation 180.1(a).

129.    Aviv Hen directly or indirectly controlled Omega Knight and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting Omega Knight's violations of Section 6(c)(1) of the Act and Regulation 180.1(a).  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), Aviv Hen is liable as a controlling person for each of Omega Knight's violations of Section 6(c)(1) of the Act and Regulation 180.1(a).

130.    The acts, omissions, and failures of Aviv Hen, Eric Hen, and any other employees or agents of Omega Knight as described in this Complaint occurred within the scope of their employment or agency with Omega Knight.  Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017), Omega Knight is liable as a principal for each act, omission, or failure of Aviv Hen, Eric Hen, and Omega Knight's other employees and agents constituting violations of Section 6(c)(1) of the Act and Regulation 180.1(a).

## COUNT II

## FRAUD IN CONNECTION WITH ILLEGAL OFF-EXCHANGE TRANSACTIONS

### Violations of Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C) (2012)

131.    Paragraphs 1 through 130 of this Complaint are re-alleged and incorporated herein by reference.

132.    Pursuant to Section 2(c)(2)(D)(iii) of the Act, 7 U.S.C. § 2(c)(2)(D)(iii) (2012), the retail commodity transactions alleged herein are subject to Section 4b of the Act, 7 U.S.C. § 6b (2012), as if they are contracts of sale of a commodity for future delivery.

133.    Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C) (2012), makes it

unlawful for any person, in or in connection with any order to make, or the making of, any

contract of sale of any commodity for future delivery that is made, or to be made, for or on

behalf of, or with, any other person, other than on or subject to the rules of a designated contract

market:

> (A) to cheat or defraud or attempt to cheat or defraud the other
> person;
>
> (B) willfully to make or cause to be made to the other person any
> false report or statement or willfully to enter or cause to be entered
> for the other person any false record; [or]
>
> (C) willfully to deceive or attempt to deceive the other person by
> any means whatsoever in regard to any order or contract or the
> disposition or execution of any order or contract, or in regard to
> any act of agency performed, with respect to any order or contract
> for or . . . with the other person.

134.    As described herein, Defendants cheated or defrauded, or attempted to cheat or

defraud, other persons; issued, or caused to be issued, false statements and records; and willfully

deceived, or attempted to deceive, other persons in connection with the offering of, or entering

into the retail commodity transactions alleged herein by, among other things, (i) making material

misrepresentations and omissions about Defendants' precious metals purchases and financing for

customers, and (ii) fabricating false trade confirmations and account statements.  Moreover,

Omega Knight and Aviv Hen misappropriated customer funds to pay for personal expenses and

Eric Hen, by fraudulently soliciting customers, facilitated this misappropriation of customer

funds.  Defendants failed to disclose, and omitted, this misappropriation of customer funds.  All

of this conduct violated Section 4b(a)(2)(A)-(C) of the Act.

135.    Omega Knight, Aviv Hen as controlling person of Omega Knight, and Eric Hen as an employee and agent of Omega Knight, engaged in acts and practices described above knowingly, willfully, or with reckless disregard for the truth.

136.    Each misrepresentation, omission, false statement, and misappropriation made during the Relevant Period is alleged as a separate and distinct violation of Section 4b(a)(2)(A)-(C) of the Act.

137.    Aviv Hen directly or indirectly controlled Omega Knight and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting Omega Knight's violations of Section 4b(a)(2)(A)-(C) of the Act.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), Aviv Hen is liable as a controlling person for each of Omega Knight's violations of Section 4b(a)(2)(A)-(C) of the Act.

138.    The acts, omissions, and failures of Aviv Hen, Eric Hen, and any other employees or agents of Omega Knight as described in this Complaint occurred within the scope of their employment or agency with Omega Knight.  Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017), Omega Knight is liable as a principal for each act, omission, or failure of Aviv Hen, Eric Hen, and Omega Knight's other employees and agents constituting violations of Section 4b(a)(2)(A)-(C) of the Act.

## COUNT III

## ILLEGAL OFF-EXCHANGE TRANSACTIONS

### Violations of Section 4(a) of the Act, 7 U.S.C. § 6a (2012)

139.    Paragraphs 1 through 138 of this Complaint are re-alleged and incorporated herein by reference.

140.     During the Relevant Period, the retail commodity transactions described in this Complaint were offered and entered into by Defendants: (a) on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis; (b) with persons who are not ECPs or eligible commercial entities as defined by the Act; and (c) without being made or conducted on, or subject to, the rules of any board of trade, exchange, or contract market.

141.     Pursuant to Section 2(c)(2)(D)(iii) of the Act, 7 U.S.C. § 2(c)(2)(D)(iii) (2012), the retail commodity transactions alleged herein are subject to Section 4(a) of the Act, 7 U.S.C. § 6(a) (2012), as if they are contracts of sale of a commodity for future delivery.

142.     As set forth above, during the Relevant Period, Defendants violated Section 4(a) of the Act by offering to enter into, entering into, executing, confirming the execution of, or conducting an office or business in the United States for the purpose of soliciting or accepting orders for, or otherwise dealing in, any transaction in, or in connection with, retail commodity transactions.

143.     Each act of offering to enter into, executing, confirming the execution of, soliciting, or accepting an order for a retail commodity transaction with a non-ECP customer and conducting an office or business in the United States for that purpose during the Relevant Period is alleged as a separate and distinct violation of Section 4(a) of the Act.

144.     Aviv Hen directly or indirectly controlled Omega Knight and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting Omega Knight's violations of Section 4(a) of the Act.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), Aviv Hen is liable as a controlling person for each of Omega Knight's violations of Section 4(a) of the Act.

145.    The acts, omissions, and failures of Aviv Hen, Eric Hen, and any other employees or agents of Omega Knight as described in this Complaint occurred within the scope of their employment or agency with Omega Knight.  Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017), Omega Knight is liable as a principal for each act, omission, or failure of Aviv Hen, Eric Hen, and Omega Knight's other employees and agents constituting violations of Section 4(a) of the Act.

## COUNT IV

## FAILURE TO REGISTER AS A FUTURES COMMISSION MERCHANT

### Violations of Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1) (2012)

146.    Paragraphs 1 through 145 of this Complaint are re-alleged and incorporated herein by reference.

147.    During the Relevant Period, Omega Knight, through its managers, employees, and agents, acted as a futures commission merchant ("FCM") by soliciting and accepting orders for agreements, contracts, or transactions described in Section 2(c)(2)(D)(i) of the Act, 7 U.S.C. § 2(c)(2)(D)(i) (2012) (the aforementioned retail commodity transactions), and, in or in connection with those transactions, accepting funds from customers.

148.    Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1) (2012), provides that it shall be unlawful for any person to be an FCM unless such person is registered with the Commission in that capacity.

149.    During the Relevant Period, Omega Knight failed to register with the Commission as an FCM, and therefore violated Section 4d(a)(1).

150.    Aviv Hen directly or indirectly controlled Omega Knight and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting Omega Knight's

violations of Section 4d(a)(1) of the Act.  Therefore, pursuant to Section 13(b) of the Act, 7

U.S.C. § 13c(b) (2012), Aviv Hen is liable as a controlling person for each of Omega Knight's

violations of Section 4d(a)(1) of the Act.

151.    The acts, omissions, and failures of Aviv Hen, Eric Hen, and any other employees

or agents of Omega Knight as described in this Complaint occurred within the scope of their

employment or agency with Omega Knight.  Therefore, pursuant to Section 2(a)(1)(B) of the

Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017), Omega Knight is

liable as a principal for each act, omission, or failure of Aviv Hen, Eric Hen, and Omega

Knight's other employees and agents constituting violations of Section 4d(a)(1) of the Act.

## VII.    RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that this Court, as authorized by

Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers, enter:

A.      An order finding that Defendants violated Sections 4(a), 4b(a)(2)(A)-(C),

4d(a)(1), and 6(c)(1) of the Act, 7 U.S.C. §§ 6(a), 6(b)(a)(2)(A)-(C), 6d(a)(1), and 9(1) (2012),

and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017);

B.      An order of permanent injunction permanently restraining, enjoining, and

prohibiting Defendants, and any other person or entity associated with them, from engaging in

conduct in violation of Sections 4(a), 4b(a)(2)(A)-(C), 4d(a)(1), and 6(c)(1) of the Act and

Regulation 180.1(a);

C.      An order of permanent injunction prohibiting Defendants, and any other person or

entity associated with them, from directly or indirectly:

(1)      Trading on or subject to the rules of any registered entity (as that term is

defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

(2)     Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2017)), for their own personal account or for any account in which they have a direct or indirect interest;

(3)     Having any commodity interests traded on their behalf;

(4)     Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

(5)     Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

(6)     Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9) (2012), 17 C.F.R. § 4.14(a)(9) (2017);

(7)     Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2017)), agent, or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (2012)), registered, exempted from registration, or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017); and

(8)     Engaging in any business activity related to commodity interests.

D.     An order directing Defendants, as well as any successors, to disgorge pursuant to such procedure as the Court may order, all benefits received from the acts or practices described herein that constitute violations of the Act and Regulations, pre-judgment interest from the date of such violations, and post-judgment interest;

29

E.      An order directing Defendants, as well as any successors, to make full restitution, pursuant to such procedure as the Court may order, to every customer whose funds Defendants received or caused another person or entity to receive as a result of the acts and practices described herein that constitute violations of the Act and Regulations, pre-judgment interest from the date of such violations, and post-judgment interest;

F.      An Order directing Defendants, as well as any successors, to rescind, pursuant to such procedure as the Court may order, all contracts and agreements, whether express or implied, entered into between them and any customer whose funds were received by Defendants as a result of the acts and practices described herein that constitute violations of the Act and Regulations;

G.      Enter an order directing each Defendant to pay a civil monetary penalty, to be assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2012), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584 (2015), title VII, Section 701, see Regulation 143.8, 17 C.F.R. § 143.8 (2017), for each violation of the Act and Regulations, as described herein;

H.      An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412 (2012); and

I.      An order directing such further relief as the Court deems proper.

Dated: June 13, 2018

Respectfully submitted,

**COMMODITY FUTURES TRADING
COMMISSION**

By: _A. Daniel Ullman II_

A. Daniel Ullman II (FL Special Bar #A5502417)
Kassra Goudarzi (FL Special Bar #A5502136)
Jason T. Wright (FL Special Bar #A5502420)
Commodity Futures Trading Commission
Division of Enforcement
1155 21st Street, NW
Washington, DC 20581
Tel:  (202) 418-5000
Fax:  (202) 418-5937
dullman@cftc.gov
kgoudarzi@cftc.gov
j_wright@cftc.gov

**ATTORNEYS FOR PLAINTIFF**